**UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION**

PAT HENSLEY                                    CIVIL ACTION NO. 13-2331

VERSUS                                         JUDGE ELIZABETH ERNY FOOTE

CITY OF SHREVEPORT, ET AL                      MAGISTRATE JUDGE HORNSBY

## MEMORANDUM RULING

Before the Court are cross-Motions for Summary Judgment, filed by the Plaintiff, Pat Hensley ("Hensley") and the Defendants, City of Shreveport and Police Chief Willie Shaw ("Chief Shaw"). [Record Documents 22 and 23]. Both parties oppose the other's motion for summary judgment and have filed opposition and reply briefs accordingly. [Record Documents 27, 28, 29, and 30]. For the reasons that follow, Hensley's motion for summary judgment is **DENIED**, while the Defendants' motion is **GRANTED**.

## BACKGROUND

The facts of this case are largely undisputed. On the afternoon of February 24, 2011, the Shreveport Police Department received a complaint that a Shreveport police officer was operating a marked unit while intoxicated. The complainant explained that he observed Hensley, a Shreveport police officer, banging on the door of a house; when the banging went unanswered, he sat down on the porch. The complainant asked Hensley what he was doing and did not believe Hensley's explanation made sense. The complainant suspected Hensley was intoxicated. According to the complainant, Hensley

then entered his marked unit and drove away, eventually stopping on the street where he ultimately was approached by fellow Shreveport police officers.

Officers responding to the complainant's call found Hensley standing near his marked unit.  Sergeant Sorrells was the first officer to approach Hensley, and she advised him of his <u>Miranda</u> rights.  When questioned, Hensley,  who was off duty, denied having consumed alcohol.  Hensley told Sergeant Sorrells and other officers that he had been trying to warn the resident of the house-- evidently a friend or acquaintance-- that the person had outstanding warrants for his arrest.  He also stated that he was on his way to the gym.  In talking with him, Sergeant Sorrells did not smell alcohol on Hensley's breath,[1] but she remarked that he was slurring badly and his eyes were "pinging."  Through the audio presented to the Court, Sergeant Sorrells can be heard commenting several times that the wind was blowing so briskly that she could not smell any alcohol.

Lieutenants Devries and Vishnefski also responded to the scene, and each performed a Field Sobriety Test on Hensley.  Lieutenant Devries could smell alcohol on Hensley's breath, although Hensley persisted in claiming he had not consumed any alcohol. He stated that he had taken Nyquil earlier that afternoon.  During the Field Sobriety Test conducted by Lieutenant Devries, Lieutenant Devries noticed "extremely constricted" pupils, which indicated the use of pain medicine.  Lieutenant Devries also observed Horizontal Gaze Nystagmus, which is an indication of impairment.  Hensley was unable to

---

[1] Hensley disputes that Sorrells was unable to smell alcohol on his breath; however, the video and audio recording taken by the various marked units' Mobile Video Recording Systems, clearly contradicts Hensley's assertion.  Record Document 23, Ex. I.

recite the alphabet or maintain balance while his eyes were closed and his head was tilted. Upon Lieutenant Vishnefski's testing, Hensley required two attempts to recite the alphabet and showed both Horizontal and Vertical Gaze Nystagmus.  On the recording, Lieutenant Vishnefski remarks that he suspects Hensley has ingested pain medication of some type. Record Document 23, Ex. I.

Hensley was arrested for Driving While Intoxicated, in violation of Louisiana Revised Statute 14:98, and transported to the police station.  There, after being advised of his rights, Hensley refused to provide a sample of his breath or submit to any other tests. He continued to deny any alcohol use.  He was transported to the Shreveport City Jail for processing.

Shortly thereafter, Chief Shaw initiated an administrative investigation and directed Sergeant Deal of Internal Affairs to obtain samples of Hensley's breath, urine, and blood in order to test for drugs and alcohol.  With the assistance of Sergeant Perkins, Sergeant Deal picked Hensley up from the jail and transported him to Willis-Knighton Work Kare to be tested.  Hensley was handcuffed in the back of Sergeant Perkins's unit, and the unit's video and audio recording system was activated.  Once they pulled into the parking lot of Work Kare, Sergeant Deal advised Hensley of his Garrity rights,[2] specifically that anything derived from the testing could not be used in a criminal proceeding against him.  Hensley was uncuffed before entering Work Kare.  Work Kare could not perform the blood test, so

---

[2] In Garrity v. State of New Jersey, 385 U.S. 493, 87 S. Ct. 616 (1967), the Supreme Court held that statements made as a result of being forced to choose between self-incrimination and the subsequent use of incriminating statements in a criminal proceeding or loss of a public job are inadmissible.

Sergeants Deal and Perkins transported Hensley to Willis-Knighton Pierremont Hospital.

Sergeant Perkins's recording was still active upon arrival at the hospital.  It is clear from the recording that Hensley was not fond of needles and did not want his blood to be drawn.  The parties dispute whether Sergeant Deal advised Hensley that he had a right to refuse the test.  Sergeant Deal's affidavit states, "I informed him that he could refuse to provide blood, but because he was ordered by Chief Shaw to provide the samples, his refusal could result in disciplinary action, up to and including termination."  Record Document 23-3, p. 5.  Curiously, however, upon questioning at a Civil Service Board hearing, Sergeant Deal was asked "Was Officer Hensley advised that he didn't have to take the blood test?"  Record Document 22-2, p. 12.  Sergeant Deal responded, "No."  Id. at p. 13.  She also testified that the Garrity form does not advise him that he has a right to refuse the blood test.  Id. at p. 12.

Hensley denies that he was ever advised of the right to refuse the test.  However, at a Civil Service Board hearing, he testified that while Sergeant Deal did not necessarily inform him of his right to refuse, "I know what the consequences are to deny any part of administrative-- . . .," which implies that he knew he could refuse but doing so would have consequences.  Record Document 22-2, p. 22.

The recording provided by the Defendants, Record Document 23, Exhibit J, captures Hensley's pointed question to Sergeant Deal, inquiring whether he has to provide a blood sample.  On this recording, the Court can ascertain Sergeant Deal saying "no," however the remainder of her answer or explanation is inaudible.  The audio then inexplicably cuts

off after that exchange.[3]    Ultimately, the hospital performed the blood test, the results of which were negative for known illegal narcotics.  The parties agree that Hensley did have alcohol in his bloodstream.

Hensley filed suit against the Defendants, contending that they violated his Fourth Amendment rights and his rights under the Louisiana State Constitution when they required him to submit to a blood test without a warrant.  He also alleges that Chief Shaw violated Louisiana Revised Statute 49:1015 by demanding a blood sample in the absence of a written policy.  The Defendants counter that there was no constitutional violation, federal or state, that the state statute at issue was complied with, and that in any event, Chief Shaw is entitled to qualified immunity.   The instant cross-motions for summary judgment followed.

## LAW AND ANALYSIS

Federal Rule of Civil Procedure 56(a) directs that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions and affidavits on

---

[3] Whether or not Hensley gave consent is a contested issue of fact, but for reasons expressed below, the Court does not find it is a germane fact that will defeat summary judgment.

[4] Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." Therefore, the case law applicable to Rule 56 prior to its amendment remains authoritative, and this Court will rely on it accordingly.

file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence.  See id. at 322-323.

Once the movant carries its initial burden, it is incumbent upon the non-moving party to demonstrate the existence of a genuine dispute as to a material fact.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348 (1986); Wallace v. Texas Tech. Univ., 80 F.3d 1042, 1047 (5th Cir. 1996)(citations omitted).  If the motion is properly made, however, Rule 56(c) requires the nonmovant to go "beyond the pleadings and designate specific facts in the record showing that there is a genuine issue for trial."  Wallace, 80 F.3d at 1047 (citations omitted).  This burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory or unsubstantiated allegations, or by a mere scintilla of evidence.  See Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)(citations omitted). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505 (1985)(citations omitted); Reid v. State Farm Mut. Auto Ins. Co., 784 F.2d 577, 578 (5th Cir. 1986)(the court must "review the facts drawing all inferences most favorable to the party opposing the motion").

Additionally, Local Rule 56.1 requires the moving party to file a statement of

material facts as to which it contends there is no genuine issue to be tried.  Pursuant to

Local Rule 56.2, the party opposing the motion for summary judgment must set forth a

"short and concise statement of the material facts as to which there exists a genuine issue

to be tried."  All material facts set forth in the statement required to be served by the

moving party "will be deemed admitted, for purposes of the motion, unless controverted

as required by this rule."  Local Rule 56.2.

**I.      Alleged Violation of Louisiana Revised Statute 49:1015.**

Louisiana Revised Statute 49:1015 provides, in pertinent part:

> A public employer may require, as a condition of continued employment,
> samples from his employees to test for the presence of drugs following an
> accident during the course and scope of his employment, *under other
> circumstances which result in reasonable suspicion that drugs are being
> used*, or as a part of a monitoring program established by the employer to
> assure compliance with terms of a rehabilitation agreement.
>
> Any public employee drug testing shall occur pursuant to a written policy,
> duly promulgated, and shall comply with the provisions of this Chapter.

La. R.S. 49:1015(A), (D)(emphasis added).   The parties agree that these provisions

govern the Shreveport Police Department's ability to test its employees for the presence

of drugs.

The thrust of Hensley's argument, and in what could be viewed as a

misrepresentation to the Court, is that Chief Shaw violated La. R.S. 49:1015 because the

governing policy, SPD 305.09, "provides for urine testing and not blood testing."  Record

Document 22-1, p. 8.  However, that misstatement is plainly contradicted by the record

evidence, specifically SPD 305.09(VI)(D), which, in combination with SPD 100.12, allows

for a blood test to be conducted amidst allegations or suspicions of  substance abuse. Specifically, 305.09(VI)(D) provides that "[a]t any time the department is in receipt of information (e.g., complaints or intelligence information) regarding the misconduct of a member relative to substance abuse an internal investigation shall be initiated.   In accordance with SPD 100.12, members shall submit to the appropriate test relative to the detection of substance abuse."  Record Document 23-3, p. 11.  SPD 100.12, in turn, provides that "employees who are the subject of an administrative investigation shall submit to any medical, physical, psychological, chemical or other tests . . . ."  Record Document 23-3, p. 15.

When directly confronted with these explicit substance abuse policies, Hensley prevaricates, contending that the phrase "members shall submit to **the** appropriate test relative to the detection of substance abuse" means that there is only <u>one</u> test that could be performed; in his opinion, the only appropriate test was a breathalyzer.  Hensley's assertion that the Defendants have failed to show that the blood test was performed pursuant to a written policy is belied by the evidence.  The Court finds that the blood test was conducted pursuant to the written policies outlined above and was supported by reasonable suspicion, which will be discussed in more detail below.

## II.   Alleged Constitutional Violations.

Hensley's next arguments focus on alleged violations of the Fourth Amendment and the Louisiana State Constitution, both of which prohibit unreasonable searches and seizures.  Hensley's primary claim is that Chief Shaw violated his constitutional rights when

he demanded a blood sample without first obtaining a warrant.  His second, though related, argument is that Chief Shaw lacked reasonable suspicion of drug abuse sufficient to justify the blood test.

The Fourth Amendment provides that the Government shall not violate "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  Searches conducted by public employers are governed by the Fourth Amendment, even when those searches are not used for the purposes of a criminal investigation.  See O'Connor v. Ortega, 480 U.S. 709, 715, 107 S. Ct. 1492, 1496 (1987).   In the instant case, the parties agree that the blood test performed on Hensley constitutes a Fourth Amendment search.  See Missouri v. McNeely, 133 S. Ct. 1552, 1558 (2013)("a compelled physical intrusion beneath [the] skin and into [the] veins" is "an invasion of bodily integrity [which] implicates an individual's most personal and deep-rooted expectations of privacy")(internal marks omitted); Maryland v. King, 133 S. Ct. 1958, 1969 (2013)( "[v]irtually any intrusion into the human body will . . . work an invasion of cherished personal security that is subject to constitutional scrutiny") (internal marks and citations omitted); Skinner v. Labor Exec. Ass'n, 489 U.S. 602, 615, 109 S. Ct. 1402, 1412 (1989)("We have long recognized that a compelled intrusion into the body for blood to be analyzed for alcohol content must be deemed a Fourth Amendment search")(internal marks omitted).

Neither the Fourth Amendment nor Louisiana's Constitution prohibits all searches, rather, the Government is limited to "reasonable" searches.  Thus, the touchstone of the

constitutional inquiry is reasonableness.   Generally, to be deemed reasonable, the law demands that a search be supported by a warrant, unless an exception to the warrant requirement applies.  Missouri, 133 S. Ct. at 1558.  Even where a warrant is not required, "a search must ordinarily be based on probable cause."  Nat'l Treasury Emp. Union v. Von Raab, 489 U.S. 656, 667, 109 S. Ct. 1384, 1392 (1989). However, as the Supreme Court has recognized, "the probable-cause standard is peculiarly related to criminal investigations. . . .  In particular, the traditional probable-cause standard may be unhelpful in analyzing the reasonableness of routine administrative functions."  Id. at 667-68, 109 S. Ct. at 1392.  Thus, "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement," a more individualized probe is necessary to evaluate reasonableness, as "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance."  Id., 109 S. Ct. at 1390-91.

This means that while a warrant and probable cause are often the starting points in a Fourth Amendment analysis, there are circumstances where neither probable cause, nor any individualized suspicion of wrongdoing, is required to uphold a search conducted by the government.  Such circumstances include "special needs, beyond the normal need for law enforcement," that is, circumstances where "concerns other than crime detection . . . are alleged in justification of a Fourth Amendment intrusion . . . ."  Pierce v. Smith, 117 F.3d 866, 873 (5th Cir. 1997).   Accordingly, based on the well-established precept that a warrant is not an indispensable component of reasonableness, the Court rejects

Hensley's contention that, in the absence of exigency, a warrantless search of his blood was per se unconstitutional.  To the contrary, and for the reasons outlined below, the Court finds that the blood test was constitutional because it was a search properly supported by reasonable, individualized suspicion of wrongdoing, and, alternatively, it was a suspicionless, special needs search.

A.   <u>Individualized Suspicion.</u>

In <u>O'Connor v. Ortega</u>, the Supreme Court carved out an exception to the warrant requirement for certain work-related searches conducted by public employers.  There, the Court upheld the warrantless search of a public employee's office where the search was initiated to investigate charges of the employee's work-related misconduct.  480 U.S. at 725-26, 107 S. Ct. at 1502.  The Court created an exception to the warrant requirement for "public employer intrusions on the constitutionally protected privacy interests of government employees for noninvestigatory, work-related purposes, as well as for investigations of work-related misconduct . . . ."  <u>Id.</u> at 725, 107 S. Ct. at 1502.  As the Court explained,

> Even when employers conduct an investigation, they have an interest substantially different from the normal need for law enforcement.  Public employers have an interest in ensuring that their agencies operate in an effective and efficient manner, and the work of these agencies inevitably suffers from the inefficiency, incompetence, mismanagement, or other work-related misfeasance of its employees.  Indeed, in many cases, public employees are entrusted with tremendous responsibility, and the consequences of their misconduct or incompetence to both the agency and the public interest can be severe.  In contrast to law enforcement officials, therefore, public employers are not enforcers of the criminal law; instead, public employers have a direct and overriding interest in ensuring that the work of the agency is conducted in a proper and efficient manner.  In our

> view, therefore, a probable cause requirement for searches of the type at
> issue here would impose intolerable burdens on public employers.  The delay
> in correcting the employee misconduct caused by the need for probable
> cause rather than reasonable suspicion will be translated into tangible and
> often irreparable damage to the agency's work, and ultimately to the public
> interest.

Id. at 724, 107 S. Ct. at 1501 (internal marks and citations omitted).  Overall, such a search is governed by a standard of reasonableness.  Id. at 718, 107 S. Ct. at 1498. Ultimately, in O'Connor, the state's "individualized suspicion of misconduct" satisfied the standard of reasonableness.

In United States v. Slanina, 283 F.3d 670, 679 (5th Cir. 2002), the Fifth Circuit Court of Appeal held that O'Connor's exception extended to a dual criminal-civil investigation of work-related misfeasance conducted by a law enforcement employer.  Citing O'Connor and United States v. Simons, 206 F.3d 392 (4th Cir. 2000), the Fifth Circuit agreed that a government employer does not "lose its special need for the efficient and proper operation of the workplace merely because the evidence obtained was evidence of a crime."  Id. at 678.  Requiring a law enforcement employer to obtain a warrant to investigate work-related misconduct, which may also reveal evidence of a crime, was a burden the Fifth Circuit explicitly declined to impose.  Id. at 679.

In the instant case, it is undisputed that the blood test was ordered for administrative reasons, pursuant to an internal affairs investigation.  The evidence clearly establishes that the results of the blood test could not be used against Hensley in any criminal proceeding.  This search was a "special needs" search, as opposed to one conducted for crime detection purposes.  Accordingly, as in O'Connor and Slanina,

reasonable suspicion of work-related misconduct was sufficient to support the blood test.

The Court finds that reasonable suspicion of impairment did, indeed, exist.  The City's own guidelines for reasonable suspicion include:  the "[s]mell of alcohol or drugs on the breath of the person;" "[d]isturbances in gait;" "[s]lurred speech;" and "[i]mpaired motor control."  Record Document 23-3, p. 44.  The evidence demonstrates that the officers had reasonable suspicion to believe that Hensley was impaired based on the behavior reported by the complainant; the smell of alcohol on his breath; his repeated, unsuccessful attempts to recite the alphabet; his inability to maintain balance; and the fact that he failed both the Vertical and Horizontal Gaze Nystagmus tests.  Furthermore, he falsely denied having taken anything other than Nyquil.  The Court rejects Hensley's unsubstantiated contention that if reasonable suspicion existed, it only existed as to alcohol impairment and did not exist as to any other sort of impairment.  Quite simply, Hensley's conclusory assertion is contradicted by the record, as officers believed, based on Hensley's pupil constriction and other factors, that he was under the influence of pain medication.

The Court's conclusion that reasonable suspicion supported the search, however, is not the end of the inquiry, for the ultimate determination of reasonableness "depends on the context within which a search takes place." O'Connor, 480 U.S. at 719, 107 S. Ct. at 1498 (quoting New Jersey v. T.L.O., 469 U.S. 325, 337, 105 S. Ct. 733, 740 (1985)). Hence, the Court must "balance[] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." Id., 107 S. Ct. at 1498-99 (internal marks omitted).  "In the case

of searches conducted by a public employer, we must balance the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control, and the efficient operation of the workplace." Id.  As the Supreme Court instructed in Chandler v. Miller, 520 U.S. 305, 318, 117 S. Ct. 1295, 1303 (1997), the government's proffered reason for drug testing an employee must be "important enough to override the [employee's] acknowledged privacy interest, sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion."  "The analysis of the privacy interest should include not only the desire to be free from mandatory testing, but also the intrusiveness of the particular program at issue." Aubrey v. School Bd. of Lafayette Parish, 148 F.3d 559, 562 (5th Cir. 1998).

Here, the Shreveport Police Department has an overarching interest in and responsibility for public safety.  The Police Department and its employees are subject to stringent regulations to ensure that those bearing the substantial burden of protecting our society are fit for duty and up to the task.  It cannot credibly be maintained that the Defendants do not have a valid interest in ruling out drug or alcohol use as the cause of its officers' impairment, especially when those officers are operating marked police units on public roadways.  Not only do the Defendants have this interest in order to maintain the efficiency and operation of their own workplace, but they have a duty, on behalf of the public at large, to discover and investigate allegations of on-the-road impairment and to protect the traveling public from the dangers presented by an impaired driver.  Indeed, in Skinner, the Supreme Court recognized as legitimate the government's interest in ensuring

the safety of the traveling public from impaired railroad workers.  <u>Skinner</u>, 489 U.S. at 621,

628, 109 S. Ct. at 1415, 1419.  The applicability of this proffered interest is bolstered by

established City of Shreveport policies governing substance abuse screening, which state

that the City

> has a legitimate concern and responsibility to ensure that its workforce can
> carry out its duty to the public in a safe manner.  The concern for safety
> includes the safety of the workers and the public.
>
> . . .
>
> It is City policy that City employees are to be free of the effects of any
> substance that makes them a safety concern to co-workers or any others or
> renders them unfit to perform their duties while at the workplace.  It is also
> City policy that City employees affected by substance abuse be afforded an
> opportunity to seek appropriate and responsive treatment for identified
> substance abuse disorders.

Record Document 23-3, p. 43.

Furthermore, it is well established that the government has a compelling interest

in ensuring the integrity of its law enforcement officers who interdict drugs and carry

firearms.  <u>Von Raab</u>, 489 U.S. at 670–71, 109 S. Ct. at 1393.   In <u>Von Raab</u>, the Supreme

Court explained that "Customs employees who may use deadly force plainly discharge

duties fraught with such risks of injury to others that even a momentary lapse of attention

can have disastrous consequences."  <u>Id.</u> at 670, 109 S. Ct. at 1393.  Here, while there is

no evidence that Hensley faced the same types of dangers as the Customs employees in

<u>Von Raab</u>, the evidence nonetheless demonstrates that he was a law enforcement officer

authorized to carry a firearm.  That he was not carrying one at the time of his arrest does

not negate the Defendants' valid interest in ensuring that the public is not put at risk by

the impairment of one of the City's armed officers.

However, a significant, compelling, or weighty Government interest, alone, does not justify a search.  Maryland, 133 S. Ct. at 1977.  Turning to the other side of the balance, the Court must weigh the governmental interest against Hensley's expectation of privacy.  The expectation of privacy "must be assessed in the context of the employment relation."  Aubrey, 148 F.3d at 564   As the Supreme Court has explained, "certain forms of public employment may diminish privacy expectations with respect to . . . personal searches."  Von Raab, 489 U.S. at 671, 109 S. Ct. at 1394.  In Von Raab, the Supreme Court found that Customs employees who were required to carry firearms or interdict illegal drugs had a diminished expectation of privacy "[b]ecause successful performance of their duties depends uniquely on their judgment and dexterity, [and thus] these employees cannot reasonable expect to keep from the Service personal information that bears directly on their fitness."  Von Raab, 489 U.S. at 672, 109 S. Ct. at 1394.  That finding applies with equal force here.

The privacy concerns here, though not absent, are minimal.  The possibility of a drug test should have come as no surprise to Hensley.  Hensley knew, by virtue of his employment with the Shreveport Police Department and the regulations thereof, that this intrusion could very well result under the circumstances he created.  Indeed, SPD 100.37 prohibits off duty employees from operating or using departmental equipment while under the influence of drugs or alcohol.  Record Document 23-3, p. 45.  Hensley acted in disregard to that policy.  He also knew that the City had a stated interest in ensuring its

work force is free from impairment and substance abuse, in general.  He knew that the City implemented a random drug testing program, under which he, as a "sworn and/or commissioned public safety employee[]" was subject to random screening.  Accordingly, the Court finds that Hensley's expectation of privacy was diminished by these factors.

There is no allegation that the blood test was used to detect anything beyond impairment.  Thus, the test did not delve into a deeper level of privacy that Hensley may have about his predisposition for or diagnosis of a specific disease, any hereditary factors that he would not want his employer to know, or anything else.  Quite simply, the blood test was used to detect whether Hensley had ingested certain controlled substances.  The test was negative.  The results demonstrate that no additional information, beyond the detection of drugs, was gleaned from that test.

Finally, the Court finds that although Hensley disliked needles and the prospect of having his blood drawn, a blood test is not unconstitutionally intrusive.  As the Supreme Court has held, "blood tests do not constitute an unduly extensive imposition on an individual's [personal] privacy and bodily integrity."  Skinner, 489 U.S. at 625, 109 S. Ct. at 1417 (quoting Winston v. Lee, 470 U.S. 753, 762, 105 S. Ct. 1611, 1617 (1985)).  In fact, the Supreme Court has stated that "the simple blood-alcohol test is  . . . safe, painless, and commonplace," South Dakota v. Neville, 459 U.S. 553, 563, 103 S. Ct. 916, 922 (1983), and "has become routine in our everyday lives," Breithaupt v. Abram, 352 U.S. 432, 436, 77 S. Ct. 408, 410 (1957).

Balancing the Defendants' interests against Hensley's privacy interests, the Court

finds that the Defendants' interests outweigh the minimal intrusion on Hensley's diminished expectation of privacy.  Accordingly, the Court holds that the drug test administered to Hensley was constitutionally reasonable and did not violate his Fourth Amendment rights.

The Court similarly finds that the test did not violate Hensley's rights under the Louisiana Constitution.[5]  As previously articulated, the search was supported by reasonable suspicion of impairment, was conducted pursuant to a state statute, was justified by a legitimate interest, was reasonable in its scope and execution, and only minimally intruded on Hensley's diminished expectation of privacy.

Finding that the blood test was in compliance with the Fourth Amendment and was done pursuant to an administrative investigation compels the conclusion that Hensley's lack of explicit, unambiguous consent does not render the test unconstitutional.  Hensley was advised of his Garrity rights and seemingly understood that he could refuse consent and face the administrative, employment-related consequences for doing so.  With this choice in mind, he submitted to the blood test.

B.    Suspicionless Search.

The Defendants alternatively argue that the blood test was a constitutionally permissible suspicionless special needs search.   The advent of suspicionless, yet constitutional, drug and alcohol tests came in two seminal Supreme Court cases:  Skinner and Von Raab.  In both of those cases, the Court concluded that the drug tests were

_____

[5] The Louisiana Constitution provides that "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy."  La. Const. Art. 1, § 5.

permissible without the usual protection of probable cause and a warrant, and even without individualized suspicion, when they qualified as a special needs search.   As the Court has already discussed, special needs are those beyond the need for law enforcement and outside the arena of crime detection.  In Skinner and Von Raab, the suspicionless tests were warranted based on the safety-sensitive tasks engaged in by the respective employees when the "risk to the public safety is substantial and real." Chandler v. Miller, 520 U.S. at 323, 117 S. Ct. at 1305.  Suspicionless searches, that is, those conducted without any particularized, individualized suspicion, have been upheld in "certain limited circumstances," Von Raab, 489 U.S. at 668, 109 S. Ct. at 1392, including:  student athletes, Vernonia School District 47J v. Acton, 515 U.S. 646, 650, 665-666, 115 S. Ct. 2386, 2389, 2396-97 (1995); Customs employees seeking a transfer or promotion to certain positions, Von Raab, 489 U.S. at 659, 109 S. Ct. at 1387; railroad employees involved in accidents or who violated particular rules, Skinner, 489 U.S. at 608-13, 109 S. Ct. at 1408-11; school custodians performing groundskeeping and using cleaning chemicals, Aubrey, 148 F.3d at 564-65;  medical residents providing emergency medical services to the public, Pierce, 117 F.3d at 880; and Public Works Department employees who operate city vehicles, drive crew members, operate heavy groundskeeping equipment, handle pesticides, and work in high-risk, high-traffic areas, Bryant v. City of Monroe, 593 F. App'x at 298-99.

Against this backdrop, the Court has no trouble finding that Hensley, as a law enforcement officer carrying a firearm and operating a City vehicle, has a safety-sensitive

position.  That conclusion, along with the finding above that the blood test was reasonable, compels the conclusion that the blood test would also be deemed constitutional even if was done without individualized, reasonable suspicion.

The Court's finding that there was no violation of Hensley's constitutional rights renders a discussion of qualified immunity unnecessary.

## CONCLUSION

After careful consideration of the briefs and exhibits filed and for the foregoing reasons, the Court finds that there are no genuine issues of material fact precluding summary judgment in favor of the Defendants.   Accordingly, **IT IS ORDERED** that Hensley's motion for summary judgment [Record Document 22] be and is hereby **DENIED**, while the Defendants' motion for summary judgment [Record Document 23] be and is hereby **GRANTED**.  All of Hensley's claims against the Defendants are **DISMISSED WITH PREJUDICE**.  A judgment consistent with the instant memorandum ruling shall issue herewith.

**THUS DONE AND SIGNED** this 30th day of March, 2015 in Shreveport, Louisiana.


ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE